United States District Court
Southern District of Texas
**ENTERED**
May 25, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EL PASO ENERGY E.S.T. COMPANY, § § Plaintiff, § VS. § CHEVRON U.S.A. INC., § § Defendant. § § | CIVIL ACTION NO. 4:20-CV-4250 |

## MEMORANDUM OPINION AND ORDER

This is a breach of contract and declaratory judgment action in which the pivotal issue is the scope of an indemnity provision in a stock purchase agreement ("SPA"). The plaintiff, El Paso Energy E.S.T. Company ("El Paso"), is a successor in interest of one of the original indemnitees, Tenneco Oil Company ("TOC"). The defendant, Chevron U.S.A. Inc. ("Chevron"), is the original indemnitor. The parties have filed cross-motions for partial summary judgment. The Court denied Chevron's motion in a short order. (Dkt. 19; Dkt. 57). The Court will now **GRANT** El Paso's motion. (Dkt. 46).

### I. BACKGROUND

The roots of this dispute reach back to October of 1988, when the SPA was executed. (Dkt. 24-3 at p. 4). The SPA memorialized TOC's sale of its energy holdings in the Gulf of Mexico to Chevron. (Dkt. 24-3 at pp. 4, 9).

*A. The structure of the sale and the language of the SPA*

TOC was a subsidiary of Tenneco Inc. ("Tenneco"). (Dkt. 24-3 at p. 9). In 1988, Tenneco and TOC decided to sell all of TOC's assets. (Dkt. 24-3 at p. 69). In order to

facilitate the sale, TOC grouped its assets into various subsidiaries, evidently by geographic region. (Dkt. 24-3 at p. 69). To hold its Gulf of Mexico assets, TOC created a subsidiary called TOC-Gulf of Mexico Inc. ("TOC-GOM"). (Dkt. 24-3 at pp. 9, 69). In June of 1988, TOC transferred the assets held by its three Gulf of Mexico divisions (Central Gulf, Eastern Gulf, and Western Gulf) to TOC-GOM. (Dkt. 24-3 at pp. 69–78). In October of 1988, Chevron purchased all of the stock in TOC-GOM, and the companies' representatives executed the SPA. (Dkt. 24-3 at pp. 9–13, 65, 97, 121).

The SPA contains thorough indemnity provisions. The provision at issue here, which is part of Section 9.03 of the SPA, reads:

> 9.03 <u>Indemnity by Buyer</u>. Buyer shall, to the fullest extent permitted by law, indemnify, defend and hold harmless Tenneco and its Affiliates, including the current and former directors, officers, employees, agents and representatives of each of them, including without limitation, individuals who were directors, officers or employees of the E&P Companies at or prior to Closing, (each of whom may be an Indemnitee pursuant to this Section 9.03) from and against the following:
>
> (a) <u>Liabilities</u>. Any and all Losses arising from Third-Party Claims in respect of the following:
>
>> (i) Liabilities, other than Retained Liabilities and Other Liabilities, relating to or arising from the Business or associated with the ownership, operation, control of the E&P Companies or the occupancy, condition or use of the assets owned, leased or operated by the E&P Companies whether or not such Liabilities relate to, arise from or are associated with the ownership, operation, control, occupancy, condition or use of such assets prior to or after the Effective Date and as to liabilities relating to matters prior to the Effective Date whether arising from the Indemnitee's negligence or gross negligence or otherwise[.]
>
> Dkt. 24-3 at pp. 51–52.

The SPA specifically defines several material terms contained in Section 9.03. "Buyer," of course, is Chevron. (Dkt. 24-3 at p. 9). "Tenneco" has the same meaning in the SPA that it does in this opinion: TOC's parent company, Tenneco Inc. (Dkt. 24-3 at p. 9). "Affiliate" means "any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified." (Dkt. 24-3 at p. 10). "Person" means "any natural person, corporation, general partnership, limited partnership, group, union, association, trust, court, agency, government, tribunal, instrumentality, commission, arbitrator, board, bureau, or other entity or authority." (Dkt. 24-3 at p. 11). The term "E&P Companies" refers to TOC-GOM and three other Tenneco subsidiaries that Chevron bought named Argosy Offshore Ltd., FC Marine Inc., and G&T Pipeline Company.[1] (Dkt. 24-3 at pp. 9, 67).

"Liability" is defined as:

> any direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise (including, without limitation, reasonable fees and expenses of counsel).
> Dkt. 24-3 at p. 11.

"Losses" incorporates the definition of "liability" and is defined as:

> any and all direct or indirect demands, claims, payments, obligations, actions or causes of action, assessments, losses, Liabilities, costs and expenses paid or incurred or diminutions in value of any kind or character (whether or not known or asserted prior to the date hereof, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or

---

[1] The other three Tenneco subsidiaries accounted for a relatively minuscule portion—a combined $9,250,000.00—of the $2.58 billion purchase price. (Dkt. 24-3 at pp. 12, 121). The parties' summary judgment briefing does not discuss them, and they do not affect the Court's analysis.

unsecured, accrued, absolute, contingent or otherwise), including without limitation, penalties, interest on any amount payable to a third party as a result of the foregoing, and, subject to Section 9.05 hereof,[2] any legal or other expenses reasonably incurred in connection with investigating or defending any claims or actions, whether or not resulting in any liability, and all amounts paid in settlement of claims or actions in accordance with Section 9.05 hereof; provided, however, that Losses shall be net of any insurance proceeds received by an Indemnitee from a nonaffiliated insurance company on account of such Losses (after taking into account any costs incurred in obtaining such proceeds and any increase in insurance premiums as a result of a claim with respect to such proceeds); provided, however, nothing in this Article IX shall require an Indemnitee to proceed against its insurance carrier.
Dkt. 24-3 at pp. 47–48.

"Third-Party Claims" incorporates the definitions of "losses" and "liability" and is defined as:

> any and all Losses (other than loss of expected or anticipated profit) which arise out of or result from (i) any claims or actions asserted against an Indemnitee by a third party, (ii) any rights of a third party asserted against an Indemnitee, or (iii) any Liabilities of, or amounts payable by an Indemnitee to a third party arising out of subparagraphs (i) or (ii), including without limitation, claims or actions asserted against an Indemnitee by any taxing authority on account of taxes.
> Dkt. 24-3 at pp. 48–49.

Finally, the SPA defines "business" as the E&P Companies' "exploration for and production of oil, natural gas and other liquid and gaseous hydrocarbons[.]" (Dkt. 24-3 at p. 9). The paragraph defining both "E&P Companies" and "business" reads as follows:

> WHEREAS, the subsidiaries of Tenneco listed in Exhibit A (the "E&P Companies") are engaged in the business of exploration for and production of oil, natural gas and other liquid and gaseous hydrocarbons (the "Business")[.]
> Dkt. 24-3 at p. 9.

---

[2] Section 9.05 of the SPA sets out claim notification procedures. (Dkt. 24-3 at pp. 54–55).

The SPA requires an indemnitee to provide timely notice of a third-party claim to an indemnitor; failure to do so precludes a claim for defense and indemnity. (Dkt. 24-3 at pp. 53–54). The indemnitor's response to the claim notice determines which party hires the counsel to defend the claim. Once the indemnitee provides its notice, the indemnitor "may assume the defense" of the third-party claim "with counsel reasonably satisfactory" to the indemnitee. (Dkt. 24-3 at p. 54). But "[i]f the Indemnitor does not notify the Indemnitee within 60 days after receipt of the Claim Notice that it elects to undertake the defense thereof, the Indemnitee shall have the right to defend at the expense of the Indemnitor the claim with counsel of its choosing reasonably satisfactory to the Indemnitor[.]" (Dkt. 24-3 at p. 55).

B. *The El Paso merger*

El Paso became a successor in interest of TOC by way of a merger and the subsequent creation of a liquidating trust. In 1996, Tenneco merged with El Paso Corporation. (Dkt. 24-2 at pp. 6–11; Dkt. 24-7 at p. 2). After the merger, Tenneco changed its name to El Paso Tennessee Pipeline Company, and TOC changed its name to EPEC Oil Company. (Dkt. 24-2 at pp. 7, 10, 12; Dkt. 24-7 at p. 2). EPEC Oil Company was then dissolved in 1998; and in 2001 the EPEC Oil Company Liquidating Trust was formed, with EPEC Oil Company as trustor and El Paso as trustee. (Dkt. 24-2 at pp. 3, 14–43; Dkt. 24-7 at p. 2). The trust agreement obligates the liquidating trust to, "as appropriate, defend, prosecute, participate in, or otherwise take action in connection with any action, suit, or proceeding involving [EPEC Oil Company or the liquidating trust]." (Dkt. 24-2 at p. 25). The trust agreement further provides that El Paso "may appear or take action in any such

action, suit, or proceeding in the name of and on behalf of [EPEC Oil Company.]" (Dkt. 24-2 at p. 25).

### C. The Louisiana lawsuit

In June of 2019, the widow of Terry Fontenot ("Fontenot"), a former TOC and Chevron employee, filed a wrongful death and survival action in Louisiana state court alleging that Fontenot died from mesothelioma caused by years of asbestos exposure ("the Louisiana lawsuit"). (Dkt. 41-4). The pleadings in the Louisiana lawsuit allege that Fontenot worked for TOC from 1967 until 1988 and that he was exposed to asbestos while working for TOC on offshore platforms off the coast of Louisiana. (Dkt. 41-4 at pp. 3–4, 15). Fontenot's widow named both El Paso and EPEC Oil Company as defendants; she also sued Travelers Insurance Company "as insurer for EPEC Oil, f/k/a Tenneco Oil Company[.]" (Dkt. 41-4 at p. 2).

It appears to be undisputed that Fontenot worked for one or more of the divisions of TOC that were consolidated in TOC-GOM and then bought by Chevron. Fontenot's earnings statement from the Social Security Administration indicates that he worked for TOC[3] from 1972 through 1988.[4] (Dkt. 24-5 at p. 8). Beginning in 1989, after Chevron bought TOC's Gulf of Mexico assets, the Social Security Administration earnings

---

[3] Because of the merger between Tenneco and El Paso Corporation, Fontenot's employer during his years with TOC is listed on his Social Security Administration earnings statement as "El Paso Natural Gas Company Employees Benefit Trust." (Dkt. 24-5 at p. 8).

[4] There is a discrepancy between the pleadings in the Louisiana lawsuit, which state that Fontenot worked for TOC from 1967 until 1988, and Fontenot's Social Security Administration earnings statement, which states that he worked for TOC from 1972 until 1988. (Dkt. 24-5 at p. 8; Dkt. 41-4 at pp. 3–4, 15). The reason for the discrepancy is unclear, and it has no effect on the Court's analysis.

statement lists Fontenot's employer as Chevron until 1993, when it appears that Fontenot retired from offshore oilfield work. (Dkt. 24-5 at pp. 8–9). Moreover, a former coworker of Fontenot's, Joseph Sonnier ("Sonnier"), testified in a deposition in the Louisiana lawsuit that he and Fontenot worked together on TOC production platforms in the Gulf of Mexico from 1975 until Chevron bought TOC-GOM. (Dkt. 24-4 at pp. 4–5, 13, 18). As apparently happened with Fontenot, Sonnier's employer changed to Chevron after Chevron bought TOC-GOM, and Sonnier retired from offshore oilfield work as a Chevron employee. (Dkt. 24-4 at pp. 13, 16, 38). Sonnier did not seem to distinguish TOC from Chevron; rather, in response to a question, Sonnier, who spent his entire offshore oilfield career with TOC and Chevron, appeared to equate the two:

> [Question:]  And did you retire from Chevron?
>
> [Answer:]  Yeah, yeah. Tenneco/Chevron. See, I was Tenneco, then I went Chevron. So basically the same.
> Dkt. 24-4 at p. 38.

In the Louisiana lawsuit, Fontenot's widow expressly "disclaim[ed] any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave." (Dkt. 41-4 at p. 4). This may have been an attempt to prevent removal to federal court under the Outer Continental Shelf Lands Act ("OCSLA") by disclaiming injuries occurring on the Outer Continental Shelf. *See, e.g., Freeman v. Phillips 66 Co.*, Nos. 14-311, 14-624, 2014 WL 1379786, at *1–2, 6 (E.D. La. Apr. 8, 2014) (remanding a case that was removed under OCSLA) ("[N]either the petition nor the deposition testimony supports a finding that the relevant facts occurred in connection with operations on the

Outer Continental Shelf (OCS) as opposed to operations in state waters within the three-mile limit.").

*D. El Paso's tender and the disposition of the Louisiana lawsuit*

El Paso tendered a demand for defense and indemnity in the Louisiana lawsuit under the SPA in November of 2019 and again in December of 2019. (Dkt. 24-6). Chevron rejected the demand by letter dated March 31, 2020, giving two reasons: (1) El Paso waited too long after learning of the Louisiana lawsuit to demand defense and indemnity; and (2) Fontenot's widow "disclaim[ed] recovery for any injuries that occurred in a federal enclave." (Dkt. 41-7).

El Paso assumed the defense of the Louisiana lawsuit and obtained a summary judgment on all claims against it based on the workers' comp bar contained in the exclusive-remedy provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA"). *See* 33 U.S.C. § 905(a). (Dkt. 41-2). The Louisiana trial judge concluded that the LHWCA and its workers' comp bar applied because the evidence in the Louisiana lawsuit conclusively established that Fontenot's exposure to asbestos on TOC's platforms, if it happened, happened on the Outer Continental Shelf. (Dkt. 41-3 at p. 21). In their papers, both El Paso and Chevron represent to the Court that the Louisiana trial judge has made the grant of summary judgment for El Paso contingent on El Paso's producing an LHWCA workers' compensation insurance policy. (Dkt. 41 at p. 2; Dkt. 46 at p. 3).

## II. THE LEGAL STANDARDS

In deciding a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court must determine whether the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted). In deciding whether a genuine and material fact issue has been created, the Court must review the facts and the inferences to be drawn from those facts in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

The SPA states that it is "governed by and construed in accordance with" Delaware law. (Dkt. 24-3 at pp. 62–63). Under Delaware law, the interpretation of contractual language is generally a question of law. *O'Brien v. Progressive Northern Insurance Co.*, 785 A.2d 281, 286 (Del. 2001). The Court may interpret an unambiguous contract as a matter of law by giving clear and unequivocal language its ordinary and usual meaning. *Id.* at 288. A contract is only ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings. *Id.* A contract "is not ambiguous simply because the parties do not agree on the proper construction." *Id.* Delaware courts will enforce a contract in which one party agrees to indemnify another party as long as the intention to indemnify is "clear and unequivocal" and the contract does not violate public policy by indemnifying a party for its own intentional or willful acts. *James v. Getty Oil Co. (Eastern Operations)*, 472 A.2d 33, 37–

38 (Del. Super. 1983); *see also All-State Investigation and Security Agency, Inc. v. Turner Construction Co.*, 301 A.2d 273, 274–75 (Del. 1972).

### III. ANALYSIS

The parties' competing motions for partial summary judgment revolve primarily around the question of whether the Louisiana lawsuit falls within the ambit of the SPA's indemnity provisions. Chevron says no; El Paso says yes. The Court agrees with El Paso.

#### A. The scope of the indemnity language

Chevron contends that the SPA does not require it to defend or indemnify El Paso because "El Paso cannot demonstrate that it would be subject to liability arising from a claim covered under the [SPA]." (Dkt. 41 at pp. 3–4).[5] The argument contains three core steps: (1) "To trigger Chevron's duty to defend under the [SPA], El Paso must show as an initial matter that the [Louisiana lawsuit] was based on a claim of asbestos exposure on a platform sold by Tenneco to Chevron[;]" (2) "[T]he undisputed evidence [in the Louisiana lawsuit] demonstrates [that Fontenot's] only alleged exposure to asbestos on Tenneco platforms sold to Chevron under the [SPA] occurred in federal waters[;]" and (3) "[Fontenot's widow] expressly disclaimed any right to recover for exposures in federal

---

[5] Although Chevron's letter rejecting El Paso's demand for defense and indemnity referenced the SPA's claim notification procedures, Chevron does not raise El Paso's alleged noncompliance with those procedures as a basis for summary judgment. The Court notes that the SPA's claim notification procedures require indemnification despite a late claim notice if the claim notice was delivered within a reasonable time after the end of the notice period or if the indemnitee can establish that the indemnitor was not prejudiced by the late delivery of the claim notice. (Dkt. 24-3 at p. 54). If nothing else, since El Paso swiftly obtained a summary judgment in the Louisiana lawsuit, it has a strong argument that Chevron was not prejudiced by El Paso's allegedly late tender. In any event, neither party discusses the timeliness of El Paso's claim notice in its summary judgment briefing, so the Court will not consider that issue as a basis for either granting or denying summary judgment in either party's favor.

waters[.]" (Dkt. 41 at pp. 3–4). Therefore, the argument continues, since Fontenot's widow effectively pled herself out of court in the Louisiana lawsuit, the SPA does not require Chevron to pay El Paso's defense costs in that suit. (Dkt. 41 at p. 4). "[A]s Chevron owes no duty to defend El Paso, it, *a fortiori*, has no duty to indemnify it." (Dkt. 41 at p. 4).

Chevron's argument contravenes the plain text of the SPA's indemnity provisions. As a threshold matter, the Court disagrees with Chevron's implied contention that it only has to pay El Paso's defense costs if there is a final judgment against El Paso. If a lawsuit falls within the scope of its indemnity provisions, the SPA expressly obligates Chevron to reimburse El Paso for "any legal or other expenses reasonably incurred in connection with investigating or defending any claims or actions, *whether or not resulting in any liability*[.]" (Dkt. 24-3 at pp. 47–48) (emphasis added).

Furthermore, the specific locations of the platforms on which Fontenot worked are irrelevant. The SPA requires Chevron to "indemnify, defend and hold harmless" Tenneco and TOC from "[a]ny and all Losses arising from Third-Party Claims in respect of . . . Liabilities . . . *relating to or arising from the Business*[.]" (Dkt. 24-3 at pp. 51–52) (emphasis added). The "Business" includes TOC-GOM's oil and gas exploration and production business. (Dkt. 24-3 at pp. 9, 67). "Losses" include "any and all . . . obligations," as well as "any legal or other expenses reasonably incurred in connection with investigating or defending any claims or actions, whether or not resulting in any liability[.]" (Dkt. 24-3 at pp. 47–48). "Third-Party Claims" include "any and all Losses (other than loss of expected or anticipated profit) which arise out of or result from . . . any claims or actions asserted against an Indemnitee by a third party[.]" (Dkt. 24-3 at p. 48). And "Liabilities"

include "any direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility[.]" (Dkt. 24-3 at p. 11). In short, under the plain language of the SPA, Chevron's obligations to pay El Paso's reasonable defense costs and to indemnify El Paso if necessary are triggered if the Louisiana lawsuit simply "relat[es] to or aris[es] from" the exploration and production activities of TOC's Gulf of Mexico divisions, irrespective of how far from the Gulf Coast Fontenot worked.

The record shows that the Louisiana lawsuit relates to and arises from the exploration and production activities of TOC's Gulf of Mexico divisions. Fontenot was allegedly exposed to asbestos while he was working for TOC, and his widow is suing for the consequences of that exposure. It appears to be undisputed that Fontenot worked for one or more of the divisions of TOC that were packaged into TOC-GOM and then bought by Chevron—and even if that fact is disputed, the record contains ample evidence showing that Fontenot worked for TOC's Gulf of Mexico divisions and no evidence at all to the contrary. These facts suffice to bring the Louisiana lawsuit within the express terms of Section 9.03 of the SPA.

### B. Chevron's response to El Paso's claim notice

In its motion, El Paso further notes that "Chevron failed to notify El Paso within 60 days that it was assuming the defense [of the Louisiana lawsuit] and thus under the explicit terms of the SPA, Chevron is obligated to reimburse El Paso for the defense costs it has incurred." (Dkt. 46 at p. 4). The SPA provides that, "[i]f the Indemnitor does not notify the Indemnitee within 60 days after receipt of the Claim Notice that it elects to undertake the defense thereof, the Indemnitee shall have the right to defend at the expense of the

Indemnitor the claim with counsel of its choosing reasonably satisfactory to the Indemnitor[.]" (Dkt. 24-3 at p. 55).

In response, Chevron contends that El Paso must "prove that a claim was actually covered for the defense-upon-claim-notice provision to apply." (Dkt. 49 at p. 3). As discussed above, El Paso has carried that burden: The Court has found that the Louisiana lawsuit falls within the express terms of Section 9.03 of the SPA. Chevron does not argue that it responded to El Paso's demand within 60 days of receiving it—and, of course, regardless of the timing of its response Chevron did not elect to undertake the defense of the Louisiana lawsuit.

The Louisiana lawsuit falls within the express terms of Section 9.03 of the SPA, and Chevron did not assume the defense of the Louisiana lawsuit within 60 days of receiving El Paso's demand for defense and indemnity. Accordingly, El Paso was entitled to assume the defense of the Louisiana lawsuit at Chevron's expense; and the SPA's indemnity provisions obligate Chevron to reimburse El Paso's reasonable defense costs and indemnify El Paso if necessary in the Louisiana lawsuit.

## IV. **CONCLUSION**

For the reasons set out in this opinion, the Court previously denied Chevron's motion for partial summary judgment (Dkt. 19; Dkt. 57), and El Paso's motion for partial summary judgment (Dkt. 46) is now **GRANTED**.

SIGNED at Houston, Texas, on May 25, 2022.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE